UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| KATHRYN GUPTON, Individually and as next friend and parent of S.T., a minor, ) ) ) | |
| Plaintiffs, ) ) ) | |
| v. ) ) ) | No. 3:08-0862 JUDGE HAYNES |
| DOUBLE DOWN TRANSPORT, INC., and ROY E. MORRISON, ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM

Plaintiffs, Kathryn Gupton, individually, and as next friend and parent of S.T., a minor, Tennessee citizens, filed this action under 28 U.S.C. § 1332, the federal diversity statute, against the Defendants, Double Down Transport, Inc., a foreign corporation with its principal place of business in New York, and Roy E. Morrison, a New York citizen, for negligence.

Before the Court is Defendants' motion for partial summary judgment (Docket Entry No. 25), contending that expert medical testimony shows that the minor plaintiff's onset of epilepsy was the result of a childhood disorder, and not the result of trauma caused by Defendants' alleged negligence. In response (Docket Entry No. 31), Plaintiffs contend that Defendants' expert's opinion is speculative.

Because Plaintiffs fail to establish that material factual disputes exist on whether S.T.'s epilepsy was caused by trauma suffered from the motor vehicle accident, the Court concludes that Defendants' motion for partial summary judgment should be granted.

## A. FINDINGS OF FACT[1]

On February 5, 2005, the minor Plaintiff, S.T., was a passenger in a vehicle driven by her father. (Docket Entry No. 32, Plaintiffs' Response to Statement of Undisputed Facts, at ¶ 1). S.T. and her father were traveling on Robertson Road in Nashville, Tennessee, and allege that they had a green light as they crossed the intersection with Briley Parkway. Id. at ¶ 2. According to Plaintiffs, Defendant Morrison failed to stop at the intersection and struck the front end of the automobile in which S.T. was riding. Id. at ¶ 3.

As a result, S.T. was knocked unconscious from the impact from the violent collision and in July 2007, S.T. suffered a seizure and was taken to Vanderbilt University Medical Center where the pediatric neurologist's diagnosis was epilepsy as a result of her head injuries. Id. at ¶¶ 4-5. S.T. will be an epileptic for the remainder of her life, requiring medical care and placing restrictions on her life. Id. at ¶ 6.

S.T.'s mother first noticed that her daughter began having staring spells in July 2007, but Vanderbilt University Neurology Clinic's ("VUNC") assessment was absence epilepsy. Id. at ¶¶ 7-8. An electroencephalogram ("EEG") revealed generalized three per second, spike-and-wave bursts

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Because there are not any material factual disputes, this section constitutes findings of fact under Fed. R. Civ. P. 56(d). Defendants do not admit that Plaintiffs had the green light as Plaintiffs crossed the intersection. This factual dispute is not material for purposes of resolving Defendants' motion for partial summary judgment.

consistent with primary generalized epilepsy, but did not show focal abnormality. Id. at ¶ 9. The latter reflects absence epilepsy.

Dr. Martin H. Wagner testified that the EEG results are consistent with absence epilepsy, an inherited type of seizure disorder. Id. at ¶ 10. Dr. Wagner agreed with the initial assessment of VUNC physicians. Id. at ¶ 11. S.T.'s medical record does not disclose a family history of epilepsy, (Docket Entry No. 28, Notice of Filing, Attachment thereto at 54) but as Dr. Wagner testified, "[W]e can't say that there's no family history. We can say that there was no recognized family history." Id. at 30. Dr. Wagner explained that S.T. "has a subtle form of epilepsy and it consists of staring spells, blank staring spells . . . [a]nd memory and confusion." Id. at 29.

VUNC physicians prescribed anti-seizure medication ethosuximide, a common and most effective medication for hereditary absence seizure disorder that the diagnosis of had been. (Docket Entry No. 32, at ¶ 12). The ethosuximide worked well, and by June 10, 2008, S.T. had been seizure free for six months. Id. at ¶ 13.

On January 6, 2009, S.T. underwent another EEG that confirmed the generalized three per second, spike-and-wave discharges consistent with absence epilepsy. Id. at ¶ 14. As to S.T.'s condition, Dr. Wagner testified as follows:

> Q. All right. Doctor, after reviewing all of the medical records, what was your impression?
>
> A. My impression was that she had idiopathic, non-convulsive, absence, also known as petit mal epilepsy of childhood.
>
> Q. Those are a lot of big words. What does idiopathic mean?
>
> A. Idiopathic means that there is no specific cause. It's not the result of tumor or trauma or stroke. It's – it is – it's not the result of drug or alcohol or poisoning. It is

the result of just – it occurs spontaneously, and the tendency is idiopathic, meaning it's usually a hereditary predisposition.

....

A. This type of seizure disorder is not the result of any abnormal pathology of the brain or trauma to the brain.

....

A. ...Absence epilepsy, also known as petit mal epilepsy, is not a form of a symptomatic seizure disorder. It is not the result of trauma to the brain, not due to brain tumor, stroke or other brain pathology. It is a disorder of childhood. Begins between the ages of 4 and 13 years. This form of epilepsy is idiopathic because no cause can be determined on imaging studies. Seizures diminish and typically resolve once the child has reached adulthood.

Id. at ¶ 15.

According to Dr. Wagner, an epilepsy caused by trauma has at least three easily cognizable differences: (1) different symptoms than S.T.'s; (2) different EEG pattern; and (3) S.T.'s positive response to her medication. Id. at ¶ 16. In addition, S.T.'s medication is contraindicated for persons with epilepsy due to trauma, as Dr. Wagner stated:

Q. What would her symptoms be if her epilepsy was caused by trauma?

A. Well, there are trauma-induced cases of epilepsy. In fact, I used to see that very commonly when I worked at Rebound. And in trauma-induced seizure disorder, typically a person has what's called complex partial epilepsy. If you want to see something - - a type of seizure that looks like absence seizures is complex partial. And in complex partial, there is an abnormal electrical discharge that arises, usually from the temporal lobe, or other localized area of the brain, but usually it's the temporal lobe, and so the person temporarily has a period of confusion, amnesia, and they may fumble and appear quite confused. They repeat themselves, might not remember their tact at all. But these spells usually last for minutes, and there's also kind of an after effect, a period of fatigue and confusion that occurs afterwards, whereas in absence epilepsy, the person snaps right back and they're back to their normal self as soon as the abnormal electrical discharge ends.

Q. And if [S.T.'s] epilepsy was caused by trauma, would you expect the EEG pattern to be different?

4

A. Very different.

Q. And how would it differ?

A. Instead - - you wouldn't see a 3 per second, spike-and-wave discharge - - generalized 3 per second, spike-and-wave. That does not occur. But instead you would see something localized, usually involving the temporal lobe or the parietal lobe, some place localized in the area of brain, and you would see these bursts of abnormal discharge....

Q. And I believe you testified that [S.T.] responded well to the medication she was given.

A. Yes.

Q. Would she have responded well to that medication if her epilepsy was caused by trauma?

A. No. The ethosuximide, in fact, is contraindicated. It's - - it is - - you should not use it in persons who have a partial onset seizure, a localization onset where it arises from a spot, because it's kind of like putting gasoline on the fire.

Id. at ¶ 17.

As to the 3T MRI that S.T. underwent on September 2, 2009, Dr. Wagner stated:

Q. And did you have an opportunity to review that test?

A. I did. This 3T MRI was performed on September 2, 2009. And a 3T MRI is a highly sensitive study. It's the most sensitive and most accurate imaging study we have for looking at soft tissues, and it's much more powerful....

Q. And what did that 3T MRI show of [S.T.]?

A. It was normal. It showed no area of posttraumatic gliosis, which is scarring. There was no hemosiderin staining from any prior bruise to the brain. And hemosiderin is the hemoglobin of your blood when it breaks down when you have a trauma of the head, to the brain, and you've bruised your brain, and you have - - the bruising is the blood that has escaped from the blood vessels and gets into the brain tissues, and then the iron will be there. Even though the blood disappears and it breaks down, the iron stays behind and it stains the brain tissue, and it's converted through enzymes to a substance called hemosiderin. That hemosiderin, when you expose hemosiderin to a magnetic field and then release that magnetic field, that hemosiderin will actually

5

glow like a light bulb in that area, and that lasts for many years or even lifetime. And there also was no area of encephalomalacia, which is a type of brain atrophy. When you've killed off the traumatized area of the brain, then you have some focal area of trauma and death of those brain tissues, and so you get a shrinkage of that particular area. And she does not have any of that.

Id. at ¶ 18.

Dr. Wagner further testified within a reasonable degree of medical certainty that S.T.'s epilepsy was not related to her motor vehicle accident and that the accident did not have any role in aggravating or accelerating S.T.'s epileptic condition. Id. at ¶¶ 19-20. On cross examination, Dr. Wagner testified:

> Q. Well, we know the accident happened in '05, and the identifying symptoms, at least from her mother's standpoint, didn't start to emerge until some year and a half later. Knowing that she had at least some degree of trauma to the head, you're not drawing any significance to the injury and this epilepsy she now has?
>
> A. No. There's no causal relationship because of the duration. If you told me that she had the onset of localization-related seizures that began within several months or even within a year of the traumatic injury, then I would say it's causally related, but you show me a three per second, generalized spike-and-wave pattern in a child, and I would say this is not – certainly this is not trauma. And this – also, the onset was a year-and-a-half, two years after the accident; therefore, it's not causally related for two reasons, because of the delay and because of the pattern that we see on the EEG and the type of seizure disorder that we're looking at.
>
> Q. So I can take it from your testimony today that regardless of this accident having occurred, [S.T.] would have developed this epilepsy?
>
> A. Yes, she would.
>
> Q. And with the type of epilepsy that you've identified as her having, can trauma accelerate this process to the point that it manifests itself?
>
> A. No.

(Docket Entry No. 28, Attachment thereto at 40-41).

6

The VUNC's medical record for S.T.'s visit on October 23, 2007 reflects findings that are consistent with absence epilepsy. (Docket Entry No. 32, at ¶ 21). The EEG report from October 23, 2007 showing an abnormal EEG, reflects a lack of idiopathic generalized epilepsy. Id. The VUNC final medical note from October 23, 2007 states that the seizures are "likely related to an idiopathic primary generalized epilepsy, such as childhood absence epilepsy or juvenile myoclonic epilepsy, although there are no other clinical features at this time to suggest JME". Id. at ¶ 22. VUNC's medical record on June 10, 2008 states that S.T. is "an 11 year old female with absence seizures, most likely associated with childhood absence epilepsy." Id. at ¶ 23.

### B. CONCLUSIONS OF LAW

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an

> otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex</u>, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But</u> <u>see</u> <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in <u>Celotex</u>:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]... must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.</u>

. . . .

Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."</u>

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:
In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Co.</u>, 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Defendants contend that the medical records from Vanderbilt Neurology Clinic and the testimony of neurologist, Dr. Martin Wagner, prove that S.T.'s epilepsy was not caused by trauma from the motor vehicle accident, but is the result of a childhood disorder. Plaintiffs contend that Dr. Wagner's testimony as to causation is speculative and cannot assist the trier of fact in determining causation as Dr. Wagner states that S.T.'s ancestors *could* have had seizure disorder that went unnoticed and untreated.

A plaintiff must establish five elements to prove a negligence claim: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, cause." McClenahan v. Cooley, 806 S.W.2d 767, 774 (Tenn. 1991). "Generally, causation of a medical condition and permanency of an injury must be established by testimony from medical experts." Boye v. Moore, No. 03A01-9812-CV-00424, 1999 WL 1068699, at *5 (Tenn. Ct. App. Nov. 24, 1999) (citing Thomas v. Aetna Life & Cas. Co., 812 S.W.2d 278, 283 (Tenn.1991)). Expert testimony is necessary to prove causation when "[t]he subject under examination must be one that requires that the court and jury have the aid of knowledge or experience such as men not specially skilled do not have . . . ." Lawrence County Bank v. Riddle, 621 S.W.2d 735, 737 (Tenn. 1981). "The inner workings of the human body, surgical procedures, proper diagnostic techniques, and other medical activities are not within the knowledge of average ordinary laymen. The medical terminology employed by doctors is strange and foreign indeed to the average juror, attorney, or judge." Id.

In Knoxville Optical Supply, Inc. v. Thomas, No. 03A01-9207CV00267, 1993 WL 574 (Tenn. Ct. App. 1993), the Tennessee Court of Appeals stated:

> There can be little doubt that the causal relation between the failure to take the medication and the onset of an epileptic seizure involves the "inner workings of the human body ... not within the knowledge of average ordinary laymen." Riddle, 621 S.W.2d at 737. Epilepsy is sufficiently mysterious to the general public that the legislature has mandated an educational program "concerning the recognition, emergency care, and continuing treatment" of epileptics. Tenn.Code Ann. § 68-49-103(4). It has been implicitly recognized that causation of epileptic seizures is a matter for expert medical testimony by treating expert testimony as a link in the causal chain between a head injury and epileptic seizures. Sears-Roebuck & Co. v. Finney, 89 S.W.2d 749, 750 (Tenn.1936). See also Bettis v. Bettis, 518 S.W.2d 396, 399 (Tex. Civ. App.1975), which recognized that the presence of epilepsy is a specialized medical matter.

Id. at *3.

Defendants contend that based upon the medical evidence and Plaintiffs' failure to present any contrary expert testimony, Plaintiffs cannot prove causation in fact or proximate cause that S.T.'s epilepsy was caused by the trauma of the vehicular accident. The Tennessee Supreme Court articulated a three-pronged test for proximate causation:

> (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

McClenahan v. Cooley, 806 S.W.2d 767, 775 (Tenn. 1991).

In Kilpatrick v. Bryant, 868 S.W.2d 594 (Tenn. 1993), the Tennessee Supreme Court explained the distinction between causation and proximate cause, stating:

> Causation and proximate cause are distinct elements of negligence, and both must be proven by the plaintiff by a preponderance of the evidence. Bradshaw v. Daniel, 854 S.W.2d 865, 869 (Tenn. 1993); McClenahan v. Cooley, 806 S.W.2d 767, 774 (Tenn.1991); Smith v. Gore, 728 S.W.2d 738, 749 (Tenn.1987). "Causation (or cause in fact) is a very different concept from that of proximate cause. Causation refers to the cause and effect relationship between the tortious conduct and the injury. The doctrine of proximate cause encompasses the whole panoply of rules that may deny liability for otherwise actionable causes of harm." King, Causation, Valuation, and

> Chance in Personal Injury Torts Involving Preexisting Injuries and Future Consequences, 90 Yale L.J. 1353, 1355 n. 7 (1981). Thus, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. McKellips v. Saint Francis Hosp., 741 P.2d 467 (Okl.1987). "Cause in fact, on the other hand, deals with the 'but for' consequences of an act. 'The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct.' " Id. at 470 (quoting Prosser and Keeton, The Law of Torts 266 (5th ed. 1984)).

Id. at 598.

Tennessee law provides that "[s]ummary judgment is *appropriate* when an essential element of negligence is missing" from the plaintiff's case in chief. Kellner v. Budget Car & Truck Rental, Inc., 359 F.3d 399, 406 (6th Cir. 2004) (emphasis added) (citing Doe v. Linder Constr. Co., Inc., 845 S.W.2d 173, 183 (Tenn. 1992)) ("For a negligence case to go before a jury, the plaintiff has the burden to present facts sufficient to establish the necessary elements of negligence."); Hannan v. Alltel Publishing Co., 270 S.W.3d 1, 8-9 (Tenn. 2008) ("[I]n Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.") (footnote omitted).

Defendants have presented expert medical testimony establishing that S.T.'s epilepsy was not caused by trauma suffered from the motor vehicle accident. Dr. Wagner's testimony is based in part on the medical findings of the VUNC and the EEG results, that these prove that S.T.'s symptoms would have been different, the lapse in time from the accident to the onset of S.T.'s symptoms, and S.T.'s response to the medication given for absence epilepsy. Plaintiffs lack any medical evidence to create an issue of material fact that S.T.'s epilepsy was caused by the motor vehicle accident, but that does not preclude a finding of other injuries. Accordingly, the Court

concludes that Defendants' motion for partial summary judgment (Docket Entry No. 25) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the 14th day of December, 2010.

                                        WILLIAM J. HAYNES, JR.
                                        United States District Judge